UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| FERNANDO PEÑA,<br><br>                Plaintiff,<br><br>    v.<br><br>CORIZON and SCOTT LOSSMAN,<br><br>                Defendants. | Case No. 1:11-cv-00366-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. 23). Plaintiff filed a Response, and Defendants filed a Reply. (Dkt. 30, 31.) Having fully reviewed the record and the materials submitted by the parties, the Court finds that the facts and legal arguments are adequately presented in the briefs and record, and that the decisional process would not be significantly aided by oral argument. *See* Dist. Idaho L. Rule 7.1(d)(1). Accordingly, based on the record before it, the Court will deny the Motion for Summary Judgment.

# CONSIDERATION OF MOTION FOR SUMMARY JUDGMENT

1. Standard of Law

    A.   *Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P.56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P.56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P.56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P.56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant

**MEMORANDUM DECISION AND ORDER - 3**

is entitled to it." Fed. R. Civ. P.56(e)(3).

   B.   *Section 1983 Claims*

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Plaintiff must show the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Plaintiff must show that Defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 . . . is not satisfied by a showing of mere causation in fact[;] [r]ather, the plaintiff must establish proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which he complains." *Id*. (internal citation omitted).

   C.   *Eighth Amendment Claims of Inadequate Medical Care*

To state a claim under the Eighth Amendment, a plaintiff must show that he is incarcerated "under conditions posing a substantial risk of serious harm," or that he has

been deprived of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002)

**MEMORANDUM DECISION AND ORDER - 5**

(citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). Nonetheless, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi,* 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v.*

**MEMORANDUM DECISION AND ORDER - 6**

*McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060.

    **D.**    ***Standard of Law re: Private Entity Performing State Function***

To bring a § 1983 claim against a municipality (local governmental entity) or a private entity performing a government function, a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (*Monell* applicable to private entities performing government functions). That is, "a municipality [or entity] can be found liable under § 1983 only where the municipality [or entity] itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Requisite elements of a § 1983 policy-based claim against a municipality or entity are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy; (3) the policy amounted to deliberate indifference to

the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir.1996) (internal quotation marks omitted)).

Where there is no identifiable written policy, sufficient evidence of any of the following can constitute an "official municipal policy" that supports a *Monell* claim: "decisions of a government's lawmakers, the acts of its policymaking officials, [or] practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

### 3. Defendants' Objection to Plaintiff's Submissions

Defendants object to Plaintiff's journal and other submissions in support of the Response to the Motion for Summary Judgment, because such items were not disclosed during discovery. (*See* Attachments to Dkt. 30.) The remedy for that omission, at this intermediate stage of proceedings, is to re-open discovery and permit Defendants to depose Plaintiff or conduct such other discovery as may be necessary to supplement their defenses. Because the Court has determined that the journal reflects essentially the same information as in the medical records submitted by Defendants, and any quarrels with Plaintiff about what his medical providers verbally told him are credibility determinations that cannot be determined on summary judgment, the items do not change the Court's decision. Therefore, the Court will consider the merits of the Motion for Summary Judgment rather than defer it until after additional discovery.

**MEMORANDUM DECISION AND ORDER - 8**

In addition, because the Motion for Summary Judgment will be denied and the Court will attempt to locate pro bono counsel for Plaintiff, the Court will re-open discovery for both parties. If, after conducting additional discovery, Defendants wish to file a second motion for summary judgment, they may do so.

**4.     Facts and Discussion**

Plaintiff alleges that Defendants delayed and denied him a knee replacement surgery that was recommended by an outside orthopedic surgeon until Plaintiff filed a grievance that threatened a lawsuit, after which the surgery was provided to him. He alleges that he needlessly suffered pain during the period of delay. Defendants disagree, and seek summary judgment on Plaintiff's claims.

    **A.**     *Medical Care from January 2009 to September 16, 2010*

The record reflects that Plaintiff, an Idaho Department of Correction inmate about age 53, reported knee problems to Texas prison medical providers in 2008, including problems while running during his exercise time. (Ryan Valley Affidavit Exhibits, Dkt. 23-5, p. 6.) Plaintiff was given a knee brace and ordered to rest. (*Id.*) Plaintiff was returned to an Idaho prison on January 4, 2009. (Dkt. 23-19, p. 2.) Plaintiff's journal reflects that, as of February 17, 2009, he was regularly engaging in running, walking to Pendyne, and working as a janitor. He had some difficulties with his knee that required him to stop and rest, but he believed the difficulties were just temporary. (Plaintiff Journal, Dkt. 31, p.3.) On March 22, 2009, Plaintiff submitted a Health Service Request Form (HSR or "kite") to request medical care for his knee. He stated he needed to have

his leg and knee x-rayed, he was experiencing a lot of pain, and he could barely walk on his leg. (Dr. Lossmann Affidavit, Dkt. 23-20, ¶ 8.)

The medical records reflect that Plaintiff saw various medical providers (other than Defendant Dr. Lossmann) to have his knee evaluated, and he followed a course of conservative treatment between March 22, 2009 and April 20, 2010, a period of approximately 13 months. (Matthew Valley Affidavit, Exhibits, Dkts. 23-4 to 23-6.)

On April 20, 2010, Plaintiff had an MRI and saw an offsite orthopedic physician, Dr. Curran. Of this visit, Dr. Curran wrote: "We discussed his treatment options. We will try viscosupplementation. If no improvement he will likely require total knee arthroplasty." (Dkt. 23-6, p. 19.) Plaintiff agreed to try the conservative treatment, and Dr. Curran administered the injection. The record reflects that the medical report from Dr. Curran showed that Plaintiff should "follow up in 6 weeks." (*Id.*)

On May 11, 2010, Dr. Lossmann sent a consultation request form to the regional medical director to request that Plaintiff see Dr. Curran again. (Valley Aff. Exhibits, Dkt. 23-6, p. 15.) In his Affidavit and briefing, Dr. Lossmann does not mention being involved in Plaintiff's care at this early date. The regional medical director did not approve another visit to Dr. Curran, but instead gave orders for an alternative treatment plan. Dr. Lossmann's Affidavit does not explain what he did when he received the instructions to pursue an alternative treatment plan. Rather, Dr. Lossmann's Affidavit implies that his first involvement with Plaintiff's treatment was in September 2010.

Plaintiff submitted an OCF on June 24, 2010, to ask about the follow-up visit with

**MEMORANDUM DECISION AND ORDER - 10**

Dr. Curran, because the medical unit had not followed up with Plaintiff. (Dkt. 30-2, p. 2.) Approximately twelve weeks after Plaintiff's visit with Dr. Curran, on July 10, 2010, Plaintiff saw a medical staff member, who told Plaintiff that he had missed a medical appointment that had been scheduled for 1:00 p.m. that day. Plaintiff alleges that the medical staff member made him sign a "Refused Treatment Form," but he was unsure why, because he was never made aware of the appointment. (Journal, Dkt. 30-1, pp. 9.)

Six days later, on July 16, 2010, Plaintiff reported slipping at Pendyne, the prison kitchen and dining area, where he worked. When Plaintiff went to the medical unit, Physician's Assistant (PA) Youkstetter examined him and diagnosed him with bilateral knee contusions. PA Youkstetter ordered Naproxen and ice bags for Plaintiff. (Lossmann Aff, Dkt. 23-20.)

Plaintiff alleges that PA Youkstetter said he would schedule an appointment with Dr. Lossmann in two weeks, but that appointment was never scheduled. Plaintiff continued to work light duty, despite the injury. (Journal, Dkt. 30-1, p. 10.)

Plaintiff submitted four OCFs on August 8, 2010, to ask for the follow-up visit with Dr. Curran, a further indication that no plan for Plaintiff's knee treatment had been put in place by that time. (Dkt. 30-2, p. 2.)

On September 9, 2010, Plaintiff submitted a Health Services Request form (HSR or "kite") regarding pain, swelling, and stiffness in his knee. He was seen by Physician's Assistant Cynthia Holmes on the same date, and she examined him and noted there were no changes since the last examination. She provided him with a knee support, advised

**MEMORANDUM DECISION AND ORDER - 11**

him to continue Naproxen, and referred him to Dr. Lossmann for a further knee evaluation, which occurred on September 17, 2010. (Lossmann Aff., Dkt. 23-20.) Plaintiff continued to work at Pendyne during this time period. (Journal, Dkt. 30-1.)

   (1) Dr. Lossmann

The record reflects that Dr. Lossmann knew of Plaintiff's serious medical condition in May 2010 and the need for a treatment plan, including an alternative treatment plan ordered by the regional medical director, but the record does not indicate that Dr. Lossmann followed up with Plaintiff to see that he was placed on the alternative treatment plan or to monitor the success of that plan.

The reasonable inference that can be drawn from Dr. Lossmann's Affidavit and the course of treatment in the medical records is that no plan was put in place for Plaintiff's knee when the second visit to Dr. Curran was denied by the regional medical director on May 13, 2010. Plaintiff submitted four OCFs on August 8, 2010, to ask for the follow-up visit with Dr. Curran, a further indication that no follow-up plan had been put in place by that time. (Dkt. 30-2, p. 2.)

In addition, the record contains two instances from which an inference can be drawn that Dr. Lossmann attempted to dissuade Plaintiff from opting for the knee surgery. Plaintiff alleges that, in September 2010, Dr. Lossman told Plaintiff that he should wait until he was 75 years old to have the he knee surgery because it had to be repeated every five years. (Dkt. 30-1, p. 10.)

In his Reply, Dr. Lossmann asserts that he "had no further involvement in the

**MEMORANDUM DECISION AND ORDER - 12**

treatment of plaintiff" after August 2011. (Dkt. 31, p. 7.) However, in November 2011, Dr. Song's consultation request for the surgery bears a note from Dr. Lossmann stating, "Please call in and discuss this case at noon conference call M-Th," which Dr. Lossmann does not explain in his Affidavit. At Plaintiff's next visit, instead of moving toward scheduling the surgery, Dr. Song offered several new options, including a partial knee replacement and a second opinion. (Lossmann Aff., Dkt. 23-20, p. 7.)

Based on the foregoing record, and because all reasonable inferences that can be drawn from the record must be drawn in Plaintiff's favor, the Court concludes that a jury could determine that Dr. Lossmann knew of and ignored Plaintiff's serious medical condition in May 2010, when he received the consultation request ordering an alternative treatment and did not put into place the alternative treatment plan, and that Dr. Lossmann attempted to delay Plaintiff's knee surgery, notwithstanding the seriousness of Plaintiff's condition, as documented by Dr. Curran. Plaintiff may proceed to trial on his deliberate indifference claims against Dr. Lossmann.

   (2)  Corizon

As to Corizon's potential liability, Plaintiff alleges:

> Defendant [Corizon] has a long history and practice of denying prisoners medical care, to save money in order to make a profit.
>
> Defendant [Corizon] denies prisoners medical care by hiring un-qualified staff, delaying and denying medical staffs' prescribed treatment, and setting guidelines on how medical staff are to treat prisoners.

(Dkt. 1, p. 3.)

**MEMORANDUM DECISION AND ORDER - 13**

Plaintiff submitted many health services request forms (HSRs) or "kites" (sent directly to the medical unit to request care), offender concern forms (OCFs) (to complain about the medical unit's lack of responsiveness to the kites), and a grievance – all requesting additional care for his knee. The OCF forms and the grievance are the prison's manner of providing Corizon supervisors and policymakers notice that individual inmates believe they are not receiving necessary medical care. The HSRs, OCFs, and the grievance set forth below all requested additional care for Plaintiff's knee after September 17, 2010, when Dr. Lossmann saw Plaintiff:

| | |
|---|---|
| Nov. 23, 2010 | Plaintiff delivered an HSR form to the medical unit requesting to see Dr. Lossmann. (Journal, Dkt. 30-1, p. 11.) Plaintiff also filed an OCF regarding the delay in surgery for his knee. The response of 12/15/10 was, "medical has received your health services request for to be seen[;] you will be scheduled to see a provider." (Dkt. 30-2, p. 5.) |
| Jan 30, 2011 | Plaintiff delivered another HSR form to the medical unit to see Dr. Lossmann about the surgery. He received no response. (Journal, Dkt. 30-1, p. 11.) |
| Feb. 25, 2011 | Plaintiff filed an OCF regarding why he had not been seen after he submitted the two HSR forms of 11-23-10 and 1-30-11. He requested a visit with Dr. Lossmann to inform him he wanted to schedule the recommended knee surgery. The response of **3/3/11** was, "You are scheduled on **3/2/11** in OPC" [a date that had passed by the time the response was prepared]. (Dkt. 30-2, p. 5.) |
| March 2, 2011 | There is no evidence in the record that Plaintiff was called out for an appointment on this date. |
| March 7, 2011 | Plaintiff was on the call out for a T.B. shot at 7 a.m., but did |

**MEMORANDUM DECISION AND ORDER - 14**

|               | not go because he "was not able to leave work for the appointment." (Journal, Dkt. 30-1, p. 12.) There is no indication in the record that this appointment was for follow-up for his knee problems. |
| :-- | :-- |
| March 7, 2011 | Plaintiff sent another OCF complaining that he had not seen Dr. Lossmann yet about the surgery. (Journal, Dkt. 30-1, p. 12.) The response of 3-15-11 stated, "You are scheduled, please watch the call-out." (Dkt. 30-2, p. 6.) |
| March 9, 2011 | Plaintiff filed a grievance stating: "I've made various attempts through Medical to inform Dr. Lossmann that I no longer feel I should delay the needed surgery that has been recommended by [the] orthopedic surgeon at St. Lukes in Meridian on 4-20-2010 for my damaged left knee." Despite all of the foregoing requests, the response was, "I don't see an HSR to be seen for this problem since [9/17/10].... Please watch the call out for an appointment in the next couple of weeks." (Dkt. 30-2, p. 17.) |
| March 21, 2011 | The medical records show that Plaintiff "put in a grievance regarding orthopedist recommendation for surgery. Per [director of nursing] to see consult clinic [with] Lossmann." (Dkt. 23-4, p. 27.) Plaintiff had an appointment to see Dr. Lossmann, and Dr. Lossmann was going to consult with Plaintiff, but Plaintiff was not seen on that date. Plaintiff was called to medical, but when he arrived, he was told that no doctor was available to see him, and that he "had to leave or get stuck for count." (Journal, Dtk. 30-1, pp. 12-13.) |
| March 21, 2011 | Despite all of the foregoing requests to the medical unit, Dr. Lossman declared that, between September 17, 2010, and March 21, 2011, he did not receive any notice that Plaintiff's knee was bothering him again. (Lossmann Aff., Dkt. 23-20, p. 6.) |
| April 4, 2011 | Plaintiff delivered an HSR form to the medical unit. (Journal, Dkt. 30-1, p. 13.) The 4/15/11 response is: "Patient is scheduled 4/19/11." (Dkt. 23-6, p. 30.) |

**MEMORANDUM DECISION AND ORDER - 15**

| | |
|---|---|
| April 15, 2011 | A "Medical Request Disposition/Response" form states: "You are scheduled. Watch the call-out." (Dkt. 30-2, p. 30.) Plaintiff was not called out. (Journal, Dkt. 30-1, p. 13.) |
| May 15, 2011 | Plaintiff sent an OCF to Nurse Walker and asked for help in scheduling an appointment with Dr. Lossmann, or he would have no choice but to file a lawsuit. (Journal, Dkt. 30-1, p. 14.) |
| May 27, 2011 | Plaintiff delivered another HSR to the medical unit to request to be seen by Dr. Lossmann regarding the knee surgery. Dr. Lossman's position is that he was going to consult with Plaintiff, but Plaintiff left the medical unit before Dr. Lossmann became available. (Journal, Dkt. 30-1, p. 14.) |
| July 6, 2011 | Plaintiff was seen by Dr. Lossmann, who noted that the last injection of 4/20/10 worked for only two weeks. Dr. Lossmann diagnosed Plaintiff's left knee "OA" as "severe." Dr. Lossmann refers Plaintiff back to Dr. Curran for "surgery v. injection." (Dkt. 23-4, p. 26.) |
| Aug. 9, 2011 | Plaintiff was taken to see Dr. Curran, who, Plaintiff reports, "was upset they had (IDOC) waited so long to bring me back to say 'yes' to surgery." (Journal, Dkt. 30-1, p. 17.) |
| Aug. 10, 2011 | A note in the file indicates that Plaintiff should have been called into the medical consultation clinic to see Dr. Lossmann, but that Plaintiff did not appear. (Dkt. 23-4, p. 19.) Nothing in the record indicates how or if Plaintiff was notified about this appointment. |
| Aug. 11, 2011 | Plaintiff filed this civil rights lawsuit. |
| Aug. 22, 2011 | Dr. Myung Song, D.O., assessed Plaintiff during a rescheduled consultation clinic appointment. Plaintiff requested the knee surgery be performed. Dr. Song requested the full report of Dr. Curran. (Dkt. 23-4, p. 25.) |
| Nov. 9, 2011 | The request for Plaintiff's knee surgery is not approved, but is stamped with a note from Dr. Lossmann asking for a |

|               | conference with Dr. Song on the request. (Dkt. 23-6, p. 8.) |
|---------------|---|
| Nov. 17, 2011 | Dr. Song offered Plaintiff the option of a unicompartment replacement rather than a total knee arthroplasty and the option of a second opinion from Dr. Spelich. (Lossmann Aff., Dkt. 23-20, p. 7.) |
| March 19, 2012 | After considering Dr. Song's advice, including possibly having a second opinion about a partial knee replacement surgery and considering religious issues regarding a blood transfusion for the surgery, Plaintiff consented and received the knee replacement surgery. |
| April 17, 2012 | Plaintiff was discharged in good condition from the prison infirmary by Dr. Cathy Whinnery. He was to start physical therapy the next day. |
| April 18, 2012 | Plaintiff had a physical therapy session. The physical therapist advised him that he would be attending physical therapy once a week. |
| May 22, 2012 | Plaintiff filed a grievance stating that he had never seen the physical therapist again. (Dkt. 30-2, p. 21.) The 5-29-12 response, by Debbie Richardson, was as follows: "Mr. Peña you have been given priority status for your physical therapy sessions. Our new on site physical therapist will be here on June 6, 2012 and you will be seen at that time. I apologize for the delay in your treatment and assure you that we are making every effort to address your physical therapy needs. The reviewing authority concurred in Richardson's decision: We have hired a physical therapist on site to provide PT appointments. We are scheduling people per medical need. I anticipate being able to address your needs once that provider is onsite on June 6, 2012. (Dkt. 30-2, p. 21.) |
| Sept. 26, 2012 | Plaintiff returned to Dr. Curran's office for follow up, where he saw Patrick McCabe, PA. The medical report reflects: "Patient is 60 m out left TKA. He is doing well with minimal discomfort and has returned to baseline stamina. He will be out of prison in 20 mo and at this point will be released to return to his trade construction. His ROM is less than optimal |

**MEMORANDUM DECISION AND ORDER - 17**

> but acceptable no effusions or other issues." (Dkt. 23-16, p. 15.)

On the foregoing record, Defendants characterize the time period from April 20, 2010, to July 6, 2011, as one in which "Mr. Peña interfered with any treatment he may have desired by failing to show for scheduled appointments" (Dkt. 23-2, p. 13), as well as one in which "Mr. Peña received thorough and continuous medical care and treatment for his left knee." (*Id.*, p. 17.) Construing the facts in a light most favorable to Plaintiff, the Court finds that a jury could conclude otherwise.

Based on the record of care, the Court concludes that Plaintiff has brought forward sufficient evidence from which a jury could find that Corizon had a custom or practice of not scheduling follow-up visits with off-site and on-site medical providers for serious medical conditions, of ignoring inmates' requests for follow-up visits for serious medical conditions, of delaying recommended surgeries, and/or of not sufficiently investigating offender concern forms and grievances filed by inmates – when an investigation into these complaints could have revealed the substantial communication difficulties within Corizon's medical delivery system specifically regarding scheduling care for serious medical conditions. Plaintiff may proceed to trial on his Eighth Amendment deliberate indifference claims against Corizon.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 23) is DENIED without

prejudice.

2. The Court's pro bono coordinator, Susie Boring-Headlee, shall contact the Federal Bar Association's pro bono liaison to attempt to find counsel for Plaintiff.

3. The Court will issue another order regarding the re-opening of discovery when counsel for Plaintiff has been found, or when it has been determined that pro bono counsel cannot be found. Plaintiff is encouraged to seek his own counsel on a contingency or other basis. If the parties wish to proceed to a settlement conference, they may file a stipulation so requesting.

DATED: **March 12, 2014**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge