UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

FERNANDO PENA,

                Plaintiff,

vs.

CORIZON and SCOTT LOSSMAN,

                Defendants.

Case No. 1:11-cv-00366-BLW

**MEMORANDUM DECISION AND ORDER**

## INTRODUCTION

Plaintiff Fernando Pena filed this action on August 8, 2011, claiming that he has not received adequate prison medical care as required by the Eighth Amendment to the United States Constitution as required by 42 U.S.C. § 1983. Mr. Pena brought claims against Defendants Corizon, LLC, and Dr. Lossmann for deliberate indifference. Defendants filed a second motion for summary judgment on November 30, 2015. Defendants' second motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

At the time relevant to this action, Plaintiff Fernando Pena ("Mr. Pena") was an inmate in the custody of the Idaho Department of Correction ("IDOC") incarcerated at the Idaho State Correctional Institution ("ISCI"). Mr. Pena alleges that Defendants, Dr. Lossmann and Corizon, LLC violated his Eighth Amendment rights through the denial or delay in approving his request for a full knee replacement. Corizon is a private corporation which is under contract to provide medical services to inmates in the custody of certain IDOC facilities.

Both parties agree that health care in IDOC facilities is patient-driven. *Defendant's Memo in Support; Plaintiff's Response* (Dkt. 48-2, p. 3; Dkt. 51, p. 3). Patients may submit a Health Service Request form ("HSR") in various places in the prison and then watch a television each day for the "call out" listing patient names and appointment times. *Defendant's Memo in Support* (Dkt. 48-2, p. 3). Alternatively, patients can go to morning sick call in the medical building each morning at 7:00 AM, submit an HSR, and depending on the seriousness of the medical condition, possibly be seen that day. *Id.*

## 1.    Mr. Pena's Medical Care from September 2008 to May 2010

In late 2008, when Mr. Pena was incarcerated at a facility in Texas, he began complaining to prison medical staff about pain he was experiencing in his left knee that made it "difficult to walk, sleep, work, and exercise." *Complaint* (Dkt. 1, p. 2). Mr. Pena returned to ISCI in January 2009. *Id.* Mr. Pena's knee was x-rayed on April 13, 2009; the x-ray showed degenerative changes to the left knee. *Lossmann Aff.* (Dkt. 23-20, ¶ 9). The medical records indicate that Mr. Pena was placed on a course of conservative treatment

between March 22, 2009 and April 20, 2010. *Valley Aff.* (Dkt. 23-4 to 23-6). Mr. Pena was not treated by Defendant Dr. Lossmann during this time.

Mr. Pena was seen by an orthopedic specialist, Dr. Curran, on April 20, 2010. Of this visit, Dr. Curran wrote: "We discussed his treatment options. We will try viscosupplementation. If no improvement he will likely require total knee arthroplasty." *Valley Aff.* (Dkt. 23-6, p.19). Mr. Pena agreed to try the conservative treatment, and Dr. Curran administered an injection of Synvisc. *Id.* Dr. Curran noted that Mr. Pena should follow up in six weeks. *Id.* A month later, on May 11, 2010, Defendant Dr. Lossmann submitted a request for another off-site visit to Dr. Curran so Mr. Pena to receive a second Synvisc injection. *Valley Aff.* (Dkt. 23-6, p.15). This request was not approved; the medical director who received it instead recommended a conservative course of treatment for Mr. Pena's osteoarthritis. *Id.*

## 2.    Medical Care from June 2010 to August 2011

Mr. Pena submitted an Offender Concern Form ("OCF") on June 24, 2010 because he had not received his follow-up with Dr. Curran. *Attachment to Pl. Response* (Dkt. 30-2, p. 2). He was then scheduled for an appointment on July 7. *Id.* On July 10, 2010, Mr. Pena missed an appointment because he was unaware that it had been scheduled, presumably because he did not see his name on the "call-out" that morning. Soon after, on July 16, Mr. Pena injured his knee when he slipped and fell while working in the kitchen. *Lossman Aff.* (Dkt. 23-20, ¶ 13). He was able to see a Physician's Assistant ("PA") that day, who ordered Naproxen and ice bags for diagnosed "bilateral knee contusions." *Id.* Mr. Pena continued to work in the kitchen after this incident.

MEMORANDUM DECISION AND ORDER - 3

Mr. Pena submitted four OCFs on August 8, 2010, regarding his follow-up visit with Dr. Curran. *Attachment to Pl. Response* (Dkt. 30-2, p. 2). When an RN returned the forms to Mr. Pena, they all advised him that he needed to submit an HSR or attend sick call in the morning to schedule an appointment. Mr. Pena submitted an HSR on September 9, 2010—the first he had submitted since he saw Dr. Curran in April. *Pena Depo* (Dkt. 48-4, pp. 55–56; Exhibit 9, p. 64). He saw a PA that day, who advised him to continue taking his Naproxen and referred him to Dr. Lossmann for a follow-up. *Lossmann Aff.* (Dkt. 23-20, ¶ 15). Mr. Pena saw Dr. Lossmann on September 17, where they discussed the risks and benefits of a total knee replacement. *Id.* This appears to be the first time Dr. Lossmann and Mr. Pena discussed the surgery. After their discussion, Mr. Pena agreed to wait to have the surgery, so Dr. Lossmann continued him on Naproxen and started him on a trial of Vicodin. *Id.*

Mr. Pena did not see Dr. Lossmann again until July 6, 2011, when Dr. Lossmann referred him to Dr. Curran for surgery or another injection. *Def. SOF* (Dkt. 49-1, ¶ 22). On August 9, 2011, the day Mr. Pena filed this lawsuit, he saw Dr. Curran for the second time. *Id.* at ¶ 23. He was scheduled up for a follow-up with Dr. Lossmann on August 22, 2011, but did not notice his name on the call-out and missed the appointment. *Id.* at ¶ 24. In response, he submitted another OCF instead of an HSR.

3.    **Medical Care from November 2011 to March 2012**

Around this time, Dr. Lossmann transitioned into an administrative role as Medical Director and began seeing fewer patients. *Lossmann Depo* (Dkt. 48-5, pp. 27–28). Mr. Pena saw Dr. Song, a new staff physician, on November 2, 2011 to discuss

treatment options. *Def. SOF* (Dkt. 49-1, ¶ 25). She submitted a request for the knee replacement that same day, and followed up with Mr. Pena on November 17. *Id.* In her progress notes from the second appointment, Dr. Song noted that Mr. Pena wanted time to consider whether he wanted a total knee replacement or a unicompartment replacement. *Valley Aff.* (23-4, pp. 23–24). Dr. Song had a follow-up appointment with Mr. Pena on December 6, 2011, where he told her he had decided on a total knee replacement. *Id.* at 24. However, on January 7, 2012, Mr. Pena submitted an OCF directed at Dr. Song, asking whether it was too late to go to St. Alphonsus for a second opinion about whether he should undergo a total or unicompartment replacement. *Def. SOF* (Dkt. 49-1, ¶ 27).

Mr. Pena's total knee replacement was approved on January 18, 2012. *Id.* He saw Dr. Curran for a pre-operative consultation on March 6, 2012, and the surgery was performed on March 19. *Valley Aff.* (Dkt. 23-9, p. 4).

## STANDARD OF LAW FOR SUMMARY JUDGMENT

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any material fact. "Material facts are those that may affect the outcome of the case." *Id.* at 248. The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P.56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P.56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P.56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P.56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec.*

MEMORANDUM DECISION AND ORDER - 6

*Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P.56(e)(3).

## DISCUSSION

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). In order to make a prima facie showing of deliberate indifference, the plaintiff must show that he: (1) faced a serious medical need, and (2) the defendants were deliberately indifferent to that medical need—that is, the defendants knew of it and disregarded it by failing to take reasonable measures to address it. *See McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992) *overruled on other grounds by WMX Tech., Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997) (en banc); *Farmer v. Brennan,* 511 U.S. 825 (1994).

## 1.      Serious Medical Need

Mr. Pena's osteoarthritis and resulting knee pain constitute a serious medical need. "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059. Examples of a serious medical need include (1) an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, (2) the presence of a medical condition that significantly affects an individual's daily activities, or (3) the existence of chronic and substantial pain. *Id.* (citations omitted). While Mr. Pena has not explained how his medical condition impacted his daily life and he admits that he developed a high threshold of pain, osteoarthritis is a condition that both reasonable doctors and patients generally find worthy of comment and treatment.

## 2.    **Deliberate Indifference**

Mr. Pena claims that Dr. Lossmann and Corizon were deliberately indifferent when they denied the second Synvisc injection and delayed his total knee replacement. Deliberate indifference requires "a purposeful act or failure to act on the part of the defendant." *McGuckin,* 974 F.2d at 1060. Therefore, deliberate indifference requires a showing of evidence that a prison official knowingly disregarded a substantial risk of serious harm to the plaintiff. *Farmer,* 511 U.S. at 836–37. To defeat summary judgment on a claim that defendants were deliberately indifferent to a plaintiff's serious medical needs, sweeping conclusory allegations will not suffice; the plaintiff must instead "set forth specific facts as to each individual defendant's deliberate indifference." *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).

MEMORANDUM DECISION AND ORDER - 8

Mr. Pena has not offered any evidence that Dr. Lossmann or Corizon knowingly disregarded a substantial risk of serious harm to him. Instead, Mr. Pena has relied on conclusory allegations that defendants delayed his surgery for nearly two years, despite the fact that the surgery was not actually "recommended" by Dr. Curran in April 2010 as Mr. Pena contends. In his progress notes, Dr. Curran wrote: "We discussed treatment options. We will try vicosupplementation. If no improvement he will likely require total knee arthroplasty." *Aff. of Ryan Valley* at ISCI 74 (Dkt. 23-6 at p.19). Mr. Pena agreed to try conservative treatment, and Dr. Curran administered an injection of Synvisc to the affected region. *Id.* Dr. Curran did not indicate when Mr. Pena would need a full knee replacement, or even definitively say that he would need the surgery. *See id.*

Further, Mr. Pena argues that defendants were deliberately indifferent because they did not implement a "complete" treatment plan because Mr. Pena was not provided with additional injections of Kenalog, Synvisc, or other steroid or viscosupplement injections. This contention is also unsupported. Both Dr. Lossmann and defendants' medical expert, Dr. Schneider, have explained that a conservative treatment plan for osteoarthritis "*may include*, among other things, weight loss, exercise, pain management, injections, bracing, physiotherapy, and walking aids." *Schneider Aff.* (Dkt. 48-13 at ¶ 8) (emphasis added). Dr. Schneider also explains that conservative treatment through exercise, muscle strengthening, anti-inflammatory medications may be effective for treating osteoarthritis; if they are not, Cortisone and hyaluronic injections may be used. *Id.* at ¶ 12. Both Dr. Lossmann and Dr. Schneider felt that Mr. Pena's treatment complied

with the requisite standard of care and Mr. Pena has not rebutted this contention with any admissible evidence.

Though Mr. Pena felt that he should have received a second injection or undergone the surgery earlier, "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a 1983 [deliberate indifference] claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient to establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). In order to prevail on a claim involving choices between alternative courses of treatment, a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Id.* (citing *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996)).

Mr. Pena has not offered any evidence that the course of treatment he underwent (daily aspirin, wearing a Neoprene knee sleeve, a continuous prescription for Naproxen, prescriptions for Vicodin (a narcotic pain reliever) and Ultram (an opioid pain reliever)) were medically unacceptable. Though Dr. Lossmann apparently felt a second Synvisc injection was warranted when he submitted a request for Mr. Pena to see Dr. Curran again, Corizon's Regional Medical Director disagreed. And although at oral argument counsel suggested there is agreement that a conservative approach was necessary, the record does not reflect that a second Synvisc injection is the only conservative approach.

As discussed above, a difference in medical opinions does not constitute deliberate indifference. Further, the Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 276 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her").

Mr. Pena also points to the fact that he was unable to see Dr. Lossmann for nearly a year after they first discussed a total knee replacement to support his claim for deliberate indifference. There is no dispute that Mr. Pena occasionally had difficulty seeing a doctor and experienced gaps in his treatment. He frequently submitted OCFs instead of HSRs, which he knew were required to schedule appointments with medical staff; missed appointments because he did not notice his name on the "call-out" in the morning; correctional officers asked him to leave the medical facility before he was able to see a doctor on two occasions, one of which occurred when he was late for an appointment and no doctor was available; and he submitted several HSRs and yet no appointment was scheduled.

Despite these unfortunate delays, there is no evidence that Dr. Lossmann was responsible for any of these issues, and there can be no finding of deliberate indifference without a showing of personal participation. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1984). HSR forms are processed by nurses, who also schedule appointments. *Dr. Lossmann Depo* (Dkt. 48-5, p.34). A staff physician only sees an HSR as part of a patient's medical chart after the nurse schedules the appointment. *Id.* Both parties agree that health care in the prison system is patient driven; when Mr. Pena failed to submit

HSRs or to appear at his scheduled appointments, it was Mr. Pena's responsibility to follow up and schedule new appointments or to attend sick call, which he could have done any morning that his work in the kitchen did not interfere.

Finally, Mr. Pena claims that if he had undergone surgery sooner, he could have enjoyed "the benefits of a unicompartment knee replacement rather than a total knee replacement," *Pl. Response* (Dkt. 51, pp. 6–7), yet the record contradicts this. When Mr. Pena saw Dr. Song in November 2011, she discussed his treatment options with him, which included both the total knee and the unicompartment replacement surgeries. *Def. SOF* (Dkt. 49-1, ¶ 25). On November 2, Mr. Pena told Dr. Song he wanted time to consider his options and make a decision. *Id.* On November 17, Dr. Song offered to get Mr. Pena a second opinion regarding the unicompartment replacement, which he declined. *Id.* Mr. Pena confirmed to Dr. Song on December 6, 2011 that he wanted to go forward with the total knee replacement, and Dr. Song submitted a request to the medical director (who at this time was Dr. Lossmann). Despite this confirmation, Mr. Pena then submitted an OCF on January 7, 2012, asking whether it was too late to go to St. Alphonsus for a second opinion about the unicompartment replacement. Mr. Pena does not explain why this did not ultimately happen, but there is no indication that he could not have undergone a partial knee replacement or that such a surgery would have been more beneficial to him.

Because Mr. Pena has not raised a triable issue of fact as to whether Dr. Lossmann or Corizon's conduct constituted deliberate indifference, summary judgment must be granted.

## ORDER

**IT IS ORDERED:**

1.  Defendants' Motion for Summary Judgment (Dkt. 48) is **GRANTED.**

2.  The Court will enter a separate judgment in accordance with Fed.R.Civ.P. 58.

DATED: March 9, 2016

B. Lynn Winmill
Chief Judge
United States District Court